### POULSON et al. v. DE NAVARRO et al.

(Supreme Court, Appellate Division, Second Department. January 25, 1901.)

1. IMPLIED CONTRACT—EVIDENCE.

Before the completion of several buildings for a corporation, payments were delayed by the failure of one of the subscribers to the company to contribute his quota of capital. A committee of the contractors and material men went to another subscriber, but he had paid his subscription, and at first would do no more for the concern. The committee then proposed that they furnish, in labor and materials, the first subscriber's quota, and this was generally acceded to. But finally an arrangement was made between the first and second subscribers by which the latter was to furnish the necessary funds for completing the buildings. The second subscriber asked and received a bonus from the contractors for relieving them of the obligation they had undertaken. One of the committee of contractors asked and received such second subscriber's personal guaranty of his own contract. The work was resumed, and no lien filed by any contractor. *Held,* that no contract binding such second subscriber to pay the contractors for the work they afterwards performed on such buildings could be implied from the facts.

2. EVIDENCE—JOINT ENTERPRISE.

Where large sums of money were paid by one man directly to contractors working under a formal contract with another, this in itself was no evidence that the first was jointly interested with the second.

3. SAME.

Where a witness stated that he had gone into an enterprise jointly with the defendant, but further that defendant was interested with him in no way except as subscriber to the same company, and as a creditor furnishing money to carry on the enterprise, this did not tend to show a joint interest between the two.

Appeal from trial term, Kings county.

Action to recover for work done by Niels Poulson and others against Jose F. De Navarro and others. From judgment in favor of defendants, plaintiffs appeal. Affirmed.

Argued before GOODRICH, P. J., and WOODWARD, HERSCHBERG, JENKS, and SEWELL, JJ.

James C. Bergen, for appellants.
George A. Strong, for respondents.

JENKS, J. The learned counsel for the appellants has argued his appeal with great ability and ingenuity, but I think that the judgment should be affirmed. In 1881, De Navarro planned to build 18 apartment houses in New York City. He took title to land in the name of Clyne, and organized eight separate apartment associations. In November, 1882, he made a contract in his own name with these plaintiffs for interior work on four of the apartment houses. All of the stock subscriptions to the apartment associations were not paid in, so that in June, 1883, De Navarro organized the Central Park

Building Company, Limited. The defendant McComb became a subscriber thereto in June, and again in September, 1883, in the amount of $400,000. De Navarro gave McComb a guaranty to take back the stock from McComb, at his option, 60 days after the buildings were completed. De Navarro was president and McComb became treasurer of this company, but resigned in 1883. Instead of paying his subscriptions into the company for its disbursement, McComb paid a large part to De Navarro, who disbursed it to the various contractors, and McComb himself paid out a large part thereof in the same channel. In the fall of 1883 the plaintiffs and the architects wrote to one another relative to work on the remaining four apartment houses, and on November 1, 1883, the architects wrote that they were authorized to accept plaintiffs' offer by letter to do this work. No formal contract for these four houses was executed, however, until the 24th of August, 1884, when the work was largely completed. At that time the plaintiffs signed a contract therefor, dated August, 1883, with the Central Park Building Company, Limited. The plaintiff testified that the execution of this contract was requested for record by one Adams, one of the officers, but that neither payments were made nor the work was done under it, but under the contract established by the said correspondence. Some time in the fall of 1883 payments to the material men and to the contractors were delayed in consequence of De Navarro's failure or inability to furnish his quota of $400,000. The contractors and material men met, and appointed a committee. That committee went back and forth between De Navarro and McComb to effect arrangements, and finally proposed to McComb to furnish in materials the $400,000 due from De Navarro to the enterprise. This was first acceptable to McComb, but finally an arrangement was made, the particulars of which I shall discuss further on, whereby McComb furnished the needed funds. Work was continued, and no liens were filed and no suits were brought by any of the contractors. A contract was made on December 1, 1883, between McComb and De Navarro, which recognized the liability of De Navarro to repay the said $400,000 first subscribed by McComb, and whereby De Navarro agreed to pay any and all sums to be thereafter advanced by McComb for the completion of the venture, which sums McComb thereby agreed to advance, provided the total cost should not exceed $4,500,000. The agreement further provided that certain security should be given to McComb, and that McComb or his agent should have the right to oversee the application of all funds to be advanced by him. There was, on the same date, a supplemental agreement made, increasing the limit from $4,500,000 to $5,000,000. And bonds and mortgages were also given to McComb for security from Clyne, who took the title to the land, and from one Scannell, on certain outside property which he held for De Navarro; and subsequently, on January 14, 1884, eight agreements were made, each one between Clyne, the Central Park Building Company, Limited, De Navarro, McComb, and one of the eight associations for erecting an apartment house, which changed the scheme by providing for conveyance of the land by Clyne to the association, and for a bond and mortgage to be given by the association to McComb. These were given, and thereafter McComb advanced

about the entire face value of the mortgages, some $1,500,000. Thus it appears that McComb's interest in the enterprise was that of a subscriber to the stock of the Central Park Building Company, Limited, in the sum of $400,000, and as a lender to De Navarro and his associates and to the apartment associations of $1,500,000, which was secured to him by bonds, mortgages, and similar obligations. The building company first opened a bank account in December, 1883, and thereafter it appears that, commencing on February 2, 1884, a large number of payments for work were made to the plaintiffs by the corporation checks drawn upon its funds in the Chemical Bank. This action is brought against De Navarro, McComb, and Adams to recover an alleged balance for work. Adams was also a subscriber to the stock of the Central Park Building Company, Limited, but died after this action was begun. De Navarro was not served. Plaintiffs complain that the defendants were "jointly interested and engaged in the building of these eight apartment houses," and that plaintiffs, at the request of the defendants, performed certain work, labor, and services for which the defendants agreed to pay. The defendant McComb answered that McComb and Adams were only interested as holders of the stock of the Central Park Building Company, Limited, and that McComb was also concerned as the creditor of De Navarro, and of the building company, and of the other associations. At the trial the plaintiffs offered testimony. The learned trial court denied the motion to dismiss at the close of the plaintiffs' case. The defendant McComb then rested, and renewed the motion, and thereupon the court dismissed the complaint on the merits. The plaintiffs appeal.

The first contract was made with De Navarro personally. The second contract, when reduced to formal terms, was made with the Central Park Building Company, Limited. Though the plaintiffs testify that this contract was executed after the work was substantially done, and that before such contract was executed the work was done under the contract before alluded to, made out by the correspondence of offer and acceptance, yet even the parties thereto, as revealed by the testimony, were but the plaintiffs and the architects. Although the architects wrote that they "were authorized," they named no principal, and none is directly indicated by the testimony. There is, then, no testimony in the case that the defendant McComb was ever party to any express contract. But the learned counsel for the appellants seeks to spell out the liability of McComb upon a contract to be implied from proof which, he claims, establishes that McComb promised to pay for the material and labor necessary to be supplied for the construction and completion of the buildings on the condition that the material men would not file liens or begin litigation, but would proceed with the work, which was done. Assuming that this cause of action was maintainable under the pleadings, there is no evidence sufficient to sustain it. De Navarro could not raise his quota of $400,000, and the problem before the contractors and material men was to procure it. The committee of the creditors attempted to effect some arrangement between De Navarro and McComb, and finally the result was an arrangement between De Navarro and McComb. One of the committee, called by the plaintiffs, testified that they went

back and forth between De Navarro and McComb. McComb said that he was anxious that there should be no trouble, that he had already paid $400,000 under agreement with De Navarro, and that he could do no more unless De Navarro could do something. The question was raised whether the creditors could not come to De Navarro's assistance, and, by their service and material, make up what he lacked. That was discussed, and the general principle was assented to, and, finally, there is proof that shows an arrangement between De Navarro and McComb. The contract of December 1, 1883, between them shows this. There is no proof that any contract was made between the plaintiffs or the creditors or their committee and McComb. One witness—a committeeman—did testify that McComb stated to him that he had agreed with De Navarro not only, but with the representative creditors. But the witness never saw any contract, though he stated that he knew the substance of it. The inquiry was pressed no further, and the testimony fails to show that any contract between the creditors or their committee and McComb was ever made. It only appears that the counsel of the committee took part in the various negotiations, for the same witness testified, "Our committee employed Mr. Goodwin as counsel, and the counsel for the three parties were in consultation day by day." There is no further proof than that the upshot of it all was the final agreement between McComb and De Navarro. Moreover, if the counsel of the committee attended the negotiations, the inference is that the creditors knew of the arrangement that culminated in the contract between De Navarro and McComb. And, further, the same witness stated that McComb told him that he had agreed to put up the money to relieve the contractors of the obligation they had undertaken. McCord, one of the committee, states that it was finally arranged that McComb should furnish $400,-000 more cash to pay bills to that extent. There is an indication that there was no contract between McComb and the creditors, for the reason that the witness McCord, one of the committee, testifies that he had large amounts of money due him, and that, being alarmed, he asked McComb to guaranty his own contract, whereupon McComb gave his personal guaranty. Though the time is not mentioned definitely, the evidence leads to the inference that this was subsequent to the arrangement by which McComb was to furnish the $400,000. The learned counsel for the appellants has argued that the facts establish a contract by McComb. It is true that McComb paid out large sums of money, through his own check book, to the extent of $390,000, directly to the contractors. Plaintiffs also showed that their first payment of October, 1883, was made to them by a check of McComb's for $9,000, and that upon their request to the architects for a payment they were sent to McComb's office. But it is also established that at this time they were doing the work under their formal contract with De Navarro, and the mere fact that they were sent to McComb for a payment under the contract is no evidence in itself that McComb was a joint venturer with De Navarro. As matter of fact, the plaintiffs' witnesses establish that De Navarro could not finance the undertaking; that McComb became a subscriber for the stock in De Navarro's corporation under De Navarro's guaranty of payment; and that after-

wards he lent further amounts to De Navarro, which the various apartment associations duly secured to him. And plaintiffs' witnesses testified that the said $9,000 payment was part of the $400,000 subscription made by McComb, and that McComb was interested in no way with De Navarro save by his stock subscription. The plaintiffs did read in evidence an answer served by their witness De Navarro in a foreclosure suit, in which De Navarro had stated, and he and McComb had agreed, that they would engage in the completion and erection of said apartment houses as a joint enterprise. And De Navarro on the witness stand in this case testified that such statement was true, as he understood it and believed it; but on further examination he also said that McComb was interested with him in no way save by these contracts,—plainly referring to the stock subscription and to the loans made by McComb upon security. The evidence does establish that McComb requested, asked for, and received a bonus for his payments, and that this was paid to him by the contractors when he disbursed the money. But this does not establish a contract between the contractors and McComb. The witness Martin, one of the committee, and a contractor, said that McComb asked it, and that McComb said he hoped he (the committeeman) would consent to allow him that commission, and would use his influence with the contractors. This is consistent with the fact that McComb had taken the place of the contractors who had first offered to stand in the breach made by De Navarro by lending the money to De Navarro in place of the proposition of the contractors to furnish the $400,000 in material, and so asked some concession or favor from them. It certainly does not appear that there was any contract with the plaintiffs for the bonus, for when Ewen, McComb's clerk, sought it from the plaintiffs, plaintiffs asked his reason for it. In Cassidy v. Hall, 97 N. Y. 170, where the defendant exacted a discount, the court said it was incompatible with the idea of a partnership. I conclude that: (1) It is not established that McComb was a partner in the eye of the law. (2) It is not established that he even made any express contract with the plaintiffs. (3) No such contract can be implied. McComb's position was either that of a stockholder or of a creditor. No conduct of his estops him. It is not claimed that the plaintiffs ever had any conversation or agreement with McComb relative to the work. The plaintiffs depended upon the committee, and the committee's own testimony shows that the arrangement contemplated was to make good De Navarro's default, and, finally, that McComb did it. If the plaintiffs were ignorant, they were not misled. If they were told by the committee in accordance with the facts testified to by the committeeman on the trial, they were not misled. If they were told by the committee falsely, McComb was not bound by the false statement, and no subsequent conduct on his part shows any ratification. I fail to find any testimony that the plaintiffs ever claimed that any one informed them that any contract between the creditors or their committee and McComb was ever made, or that the plaintiffs ever forebore to file a lien or enter a suit, or that they had either remedy at any time in contemplation. Nor is it established that there was any default in any payments due to the plaintiffs at the time that

it is claimed that McComb infused new life into this enterprise. Under the alleged contract by letter, there is no provision for payment until the work is completed. Ewen testifies that the bonus was asked because McComb had guarantied the contracts. If the theory of the action is that of guaranty, it cannot be maintained under the pleadings. Cassidy v. Hall, supra. There is a manifest distinction between this case and the authority mainly relied upon by the appellants,—Zabriskie v. Coates, 41 App. Div. 316, 58 N. Y. Supp. 523. In the case at bar, our view of the testimony is that it establishes that McComb's interest was that of a stockholder of the Central Park Building Company, Limited, and of a creditor of De Navarro and the building companies for moneys advanced upon certain securities; whereas in the Zabriskie Case it was established that the defendants were jointly interested in the property itself. The plaintiffs in this case disavow any recovery sought for any alleged defects in the creation of the corporation, so that we are relieved from the consideration of that question.

The judgment must be affirmed, with costs. All concur, except SEWELL, J., taking no part.